THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONNIE E. JONES, JR., Defendant-Appellant.

Third District  No. 4—97—0388

Opinion filed September 16, 1998.

Daniel D. Yuhas and Jacqueline L. Bullard (argued), both of State Appellate Defender's Office, of Springfield, for appellant.

Michael J. Kick, State's Attorney, of Kankakee (John X. Breslin and Gary F. Gnidovec (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LYTTON delivered the opinion of the court:

Defendant Ronnie E. Jones, Jr., was indicted on a charge of aggravated battery of a police officer and charged by traffic citations with illegal sound amplification, reckless driving and disobeying a police officer. A jury convicted him on all charges. Defendant was sentenced to five years' incarceration for aggravated battery and assessed court costs on all other convictions. On appeal, defendant challenges: (1) the constitutionality of the sound amplification statute (625 ILCS 5/12—611 (West 1996)); (2) the sentence imposed for aggravated battery; and (3) the calculation of fees and costs assessed in relation to his prosecution. We affirm in part, reverse in part, and remand for the entry of a judgment reflecting the correct amount of fees and costs.

## I. FACTS

In the early morning hours of October 17, 1996, Sergeant Barry Thomas stopped defendant because of the excessive volume emitting from defendant's car radio. Sergeant Thomas approached the driver's side of defendant's car, shined his flashlight in the window and asked to see defendant's license and insurance card. Refusing to comply, defendant stated that he had not been speeding and asked why the officer had stopped him. Sergeant Thomas stated he would explain later and reached for the handle on the car door. Finding the door locked, the officer reached through defendant's car window, which was down approximately six inches, to unlock the door. When the officer unlocked the door, defendant slapped his hand away and relocked the door. In an effort to divert defendant's attention from the lock, the officer then hit defendant in the chest with the flashlight.

At this point, a backup patrol car arrived, and Sergeant Thomas called out for assistance as he attempted to unlock the door again. Suddenly, defendant accelerated and drove off with Sergeant Thomas' right arm still inside the car. The officer clamped his right arm down on the glass, lifted his feet and yelled to defendant to stop. The backup officers followed in pursuit and testified at trial that despite the fact that Sergeant Thomas was hanging onto the car, defendant reached speeds in excess of 70 miles per hour and traveled one mile and a half before finally pulling over. Sergeant Thomas sustained bruises on the inside of his upper right arm.

Defendant testified that he had poor eyesight and was blinded by the flashing lights from Sergeant Thomas' police car and from the flashlight. He testified that he did not know it was a real police officer who pulled him over, that he drove away in fear after being hit in the chest with the flashlight and that he continued to drive at high speeds for more than a mile because he was afraid the person hanging onto

his car would hurt him. The jury convicted defendant on all four counts.

At sentencing, the State introduced evidence of defendant's prior conviction for aggravated battery of a peace officer. Defendant's intoxication at the time of the prior offense was a mitigating factor, and he received a sentence of probation. Testifying on defendant's behalf, an employer stated that defendant was reliable and trustworthy. His family and friends testified that he was loving, patient and affectionate. In addition, defendant addressed the court and expressed remorse for the incident, as well as his thankfulness that no one was seriously injured.

The court sentenced defendant to five years' incarceration for aggravated battery, and it entered judgment for costs for the sound amplification, disobeying a police officer and reckless driving violations.

## II. ANALYSIS

### A. CONSTITUTIONALITY OF THE SOUND AMPLIFICATION STATUTE

■ Section 12—611 of the Illinois Vehicle Code provides in pertinent part:

> "No driver of any motor vehicle within this State shall operate or permit operation of any sound amplification system which can be heard outside the vehicle from 75 or more feet when the vehicle is being operated upon a highway, unless such system is being operated to request assistance or warn of a hazardous situation.
>
> *This Section does not apply to* authorized emergency vehicles or *vehicles engaged in advertising.*" (Emphasis added.) 625 ILCS 5/12—611 (West 1996).

On appeal, defendant contends that the statute is unconstitutional because it is content-based and is overbroad in violation of the first amendment of the United States Constitution (U.S. Const., amend. I) and denies equal protection in violation of the fourteenth amendment (U.S. Const., amend. XIV).

■ Legislative enactments are presumed to be constitutional (*People v. Warren*, 173 Ill. 2d 348, 355, 671 N.E.2d 700, 704 (1996)) and all reasonable doubts are to be resolved in favor of upholding legislation (*People v. Holt*, 271 Ill. App. 3d 1016, 1026, 649 N.E.2d 571, 579-80 (1995)). When a court decides whether a statute violates the first amendment, it must consider that each medium of communication creates a unique set of first amendment problems that must be assessed in light of the "differing natures, values, abuses and dangers" of that medium. *Kovacs v. Cooper*, 336 U.S. 77, 97, 93 L. Ed. 513, 528, 69 S. Ct. 448, 459 (1949) (Jackson, J., concurring).

■ Music is a form of expression and communication protected by the first amendment. *Ward v. Rock Against Racism*, 491 U.S. 781, 790, 105 L. Ed. 2d 661, 674, 109 S. Ct. 2746, 2753 (1989). However, sound amplification in streets and public places is subject to reasonable regulation. *Kovacs*, 336 U.S. at 89, 93 L. Ed. at 523, 69 S. Ct. at 455.

■ In determining whether a restriction on expression passes constitutional muster, courts apply a two-tiered system of review. An intermediate level of judicial scrutiny is used where the regulation is unrelated to content. *Turner Broadcasting, Inc. v. Federal Communications Comm'n*, 512 U.S. 622, 642, 129 L. Ed. 2d 497, 517, 114 S. Ct. 2445, 2459 (1994). On the other hand, where a regulation suppresses, disadvantages or imposes differential burdens upon speech because of its content, "the most exacting scrutiny" must be applied. *Turner Broadcasting*, 512 U.S. at 642, 129 L. Ed. 2d at 517, 114 S. Ct. at 2459. Such content-based discrimination is "presumptively impermissible" (*City of Ladue v. Gilleo*, 512 U.S. 43, 59, 129 L. Ed. 2d 36, 50, 114 S. Ct. 2038, 2047 (1994) (O'Connor, J., concurring)), and will be upheld only if it is narrowly tailored to serve a compelling state interest (*Widmar v. Vincent*, 454 U.S. 263, 269-70, 70 L. Ed. 2d 440, 447-48, 102 S. Ct. 269, 274 (1981); *People v. Sanders*, 182 Ill. 2d 524, 530 (1998)) with the least possible burden on expression (*Phillips v. Borough of Keyport*, 107 F.3d 164, 172 (3d Cir. 1997)).

In *Ward v. Rock Against Racism*, the supreme court considered a city regulation that restricted the volume of music played in a park bandshell. *Ward*, 491 U.S. at 790, 105 L. Ed. 2d at 674, 109 S. Ct. at 2753. In upholding the regulation, the Supreme Court stressed that it (a) was enacted to protect surrounding neighbors and park visitors, (b) regulated only the time, place and manner of expression, and (c) forbade enforcement that would *"vary the *** volume based on the message being delivered"* (emphasis added). *Ward*, 491 U.S. at 794-95, 105 L. Ed. 2d at 677, 109 S. Ct. at 2755.

Similarly, in *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 428, 123 L. Ed. 2d 99, 116, 113 S. Ct. 1505, 1516 (1993), the Supreme Court stated:

> "[A] prohibition against the use of sound trucks emitting 'loud and raucous' noise in residential neighborhoods is permissible *if it applies equally to music, political speech, and advertising.*" (Emphasis added.)

*Ward* and *Discovery Network* speak to the point of conflict in this case.

■ We conclude that the Illinois sound amplification statute (625 ILCS 5/12—611 (West 1996)) violates the first amendment by regulating speech on the basis of content without a compelling state interest. Section 12—611 restricts the amplification of religious speech, politi-

cal speech and music, but exempts advertising. Unlike the rule challenged in *Ward,* the restrictions found in section 12—611 do not apply equally to all types of amplified sound. Different types of speech are treated differently. Since the permissible degree of amplification is dependent on the nature of the message being conveyed, the statute is content-based (*Regan v. Time, Inc.,* 468 U.S. 641, 648, 82 L. Ed. 2d 487, 494, 104 S. Ct. 3262, 3265 (1984)) and subject to strict scrutiny (*Turner Broadcasting,* 512 U.S. at 642, 129 L. Ed. 2d at 517, 114 S. Ct. at 2459).

Although we wholeheartedly agree that the State of Illinois has a substantial interest in protecting its citizens from unwelcome noise on city streets (*Ward,* 491 U.S. at 796, 105 L. Ed. 2d at 678, 109 S. Ct. at 2756), the State has failed to provide a compelling reason for discriminating between the amplification of commercial speech and noncommercial speech (see *Sanders,* 182 Ill. 2d at 529). Indeed, the State's brief does not even attempt to argue that such an interest exists, and we are unable to find a compelling reason for the distinction. While the statute seeks to protect the citizens of Illinois from loud decibel levels at close distances, nothing in the record, briefs or legislative history suggests why commercial speech should be afforded an exemption. Cf. *Board of Trustees of the State University v. Fox,* 492 U.S. 469, 477, 106 L. Ed. 2d 388, 402, 109 S. Ct. 3028, 3033 (1989) (commercial speech enjoys only a "limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values").

In an odd twist, section 12—611 actually turns the constitutional requirement for judicial review on its head. Courts apply heightened scrutiny to restrictions on such cherished freedoms as political speech and religious expression, for which this country has "march[ed] our sons and daughters off to war" (*Young v. American Mini Theater, Inc.,* 427 U.S. 50, 70, 49 L. Ed. 2d 310, 326, 96 S. Ct. 2440, 2452 (1976)); in contrast, commercial speech is subject to "modes of regulation that might be impermissible in the realm of noncommercial expression" (*Fox,* 492 U.S. at 477, 106 L. Ed. 2d at 402, 109 S. Ct at 3033). Ironically, section 12—611 provides greater protection to commercial speech. This topsy-turvy reversal of constitutional priorities cannot stand. See generally *United States v. Edge Broadcasting Co.,* 509 U.S. 418, 429, 125 L. Ed. 2d 345, 356-57, 113 S. Ct. 2696, 2705 (1993).

As presently written, section 12—611 unconstitutionally discriminates in favor of amplified advertising and against speech with

religious, political and other noncommercial content. We urge the General Assembly to revise the statute to make it content-neutral.[1]

Defendant's conviction for illegal sound amplification is reversed, and thus we need not address his claims that the statute is overbroad and denies equal protection of the laws.[2]

## B. SENTENCE FOR AGGRAVATED BATTERY

Defendant next contends that the State improperly raised and the trial court improperly considered an element of the offense, the victim's occupation as a peace officer, as part of the rationale for imposing a five-year term of incarceration. See 720 ILCS 5/12—4(b)(6) (West 1996); *People v. Gramo*, 251 Ill. App. 3d 958, 970, 623 N.E.2d 926, 935 (1993) (essential element of offense may not be relied upon by the court to enhance punishment).

■ A trial judge's reliance on an improper factor at sentencing does not always necessitate remandment for a new hearing. *People v. Bourke*, 96 Ill. 2d 327, 332, 449 N.E.2d 1338, 1340 (1983). Here, defendant's failure to raise the issue in his motion to reduce sentence constitutes waiver on appeal. 134 Ill. 2d R. 615(a).

■ Defendant requests that we review this alleged error under the plain error rule, which can be invoked for sentencing irregularities if

---

[1] Defendant has not challenged the State's interest in providing a special exemption for authorized emergency vehicles (625 ILCS 5/12—611 (West 1996)), and nothing in this decision should be construed as questioning the constitutionality of this exemption.

[2] The dissent's claim that the statute distinguishes between speakers, but not content, is incorrect. Under the statute, the same driver is either restricted or not restricted based solely upon the content of his message. When making a political statement, he is restrained. When amplifying a mercantile message, he is unfettered. This is content-based regulation.

Further, while the dissent claims that "[t]he legislature may have rationally concluded that advertising vehicles do not present the same dangers to the public peace and safety and decided to exempt them from the statute," this assertion is not supported by citation, legislative history, science or logic. 299 Ill. App. 3d at 749. The dissent cannot explain how a religious or political message at a particular decibel level poses a danger to the public, while a commercial message at the same volume does not.

Just as elusive is the dissent's claim that "the requirement of narrow tailoring is satisfied ***. [Citation.] The statute targets the problem of excessive noise from 'boom box cars' ***." 299 Ill. App. 3d at 751. Left unanswered is why all political and religious speech must be muffled in order to eliminate the problem of loud music from "boom box cars." If we were to assume that the dissent is correct in its assumption about the legislative purpose, a formidable overbreadth issue would need to be addressed.

the evidence was closely balanced or a defendant was denied a fair hearing. *People v. Beals*, 162 Ill. 2d 497, 511, 643 N.E.2d 789, 796 (1994). After reviewing the record, we hold that plain error did not occur.

A judge is not required to refrain from any mention of factors that constitute elements of an offense. *People v. Barney*, 111 Ill. App. 3d 669, 679, 444 N.E.2d 518, 525 (1982). The judge may consider the nature and circumstances of the offense, and mere reference to the existence of such a factor is not reversible error. *Gramo*, 251 Ill. App. 3d at 971, 623 N.E.2d at 935, citing *People v. Tolliver*, 98 Ill. App. 3d 116, 117-18, 424 N.E.2d 44, 45 (1981). After reviewing the judge's comments in context, we find that statements regarding the victim's occupation were made within the judge's discussion of the factual circumstances of the crime, *i.e.*, how defendant initiated the incident by refusing to produce his license and then escalated a routine traffic stop into a high-speed chase while an officer was hanging onto the car. The record does not support defendant's contention that the judge improperly relied on the victim's occupation or enhanced the sentence on this basis.[3]

Moreover, the evidence at sentencing was not closely balanced, and defendant has failed to show that the alleged error deprived him of a fair hearing. The judge determined that defendant's offense was serious, his violent behavior endangered the public, there existed a need for deterrence, defendant had a prior criminal record that included a conviction for aggravated battery against a peace officer and another sentence of probation would be inconsistent with the ends of justice. The trial judge found no factors in mitigation.

Aggravated battery of a police officer is a Class 3 felony (720 ILCS 5/12—4(e) (West 1996)), and defendant was eligible for an extended term because of a prior conviction for aggravated battery of a police officer (730 ILCS 5/5—5—3.2(b)(1) (West 1996)). In this case, the potential sentencing range included probation (730 ILCS 5/5—6—1(a) (West 1996)) to a maximum extended term of 10 years in prison (730 ILCS 5/5—8—2(a)(5) (West 1996)). The trial court sentenced defendant to five years. Given the substantial factors in aggravation, including defendant's prior failed attempt at rehabilitation through probation, and the lack of mitigating factors, this mid-range sentence was well within the discretion of the trial court.

We affirm defendant's sentence for aggravated battery of a peace officer.

---

[3] Similarly, when viewed in context, the prosecutor's reference to the victim as a police officer was in the context of asserting the need for a strong deterrent. We find no error in the State's argument.

## C. ASSESSMENT OF FEES AND COSTS

■ Finally, defendant argues that the court incorrectly assessed fees and costs for his one felony, one misdemeanor and two petty offenses and contends that he is entitled to a $120 credit. The State agrees that defendant is entitled to a credit, but calculates the correct amount to be only $100. According to the State, defendant failed to include in his calculation the $10 State's Attorney fee for each of the two petty offense convictions.

We agree with the State's calculation. See 55 ILCS 5/4—2002 (West 1996) (State's Attorney is entitled to a fee of $10 for each conviction that could have been assigned to an associate judge, whether or not it was so assigned). However, in light of our decision reversing defendant's conviction for illegal sound amplification, on remand the circuit court will need to make additional changes to the fees and costs assessed against defendant.

## III. CONCLUSION

For the reasons stated above, the judgment of the circuit court of Kankakee County is affirmed in part, reversed in part, and this cause is remanded for the entry of an amended judgment order.

Affirmed in part, reversed in part, and remanded for further proceedings.

HOMER, P.J., concurs.

JUSTICE SLATER, dissenting:

Rather than conducting a meaningful analysis and application of constitutional guidelines, the majority declares, based solely on the statute's exemption of advertising vehicles, that the statute regulates speech on the basis of content without a compelling state interest. I find that such a mechanical approach trivializes the first amendment and must disagree with the majority's conclusion.

In setting out the two-tiered system of constitutional scrutiny, the majority refers briefly to *Turner Broadcasting*, 512 U.S. 622, 129 L. Ed. 2d 497, 114 S. Ct. 2445, for the principle that the most exacting scrutiny must apply to regulations that suppress, disadvantage or impose differential burdens on speech because of its content. However, the majority fails to address a critical distinction highlighted by the Court, which is that not all regulations distinguishing between speakers warrant strict scrutiny. *Turner Broadcasting*, 512 U.S. 622, 129 L. Ed. 2d 497, 114 S. Ct. 2445. Instead, it is only if the speaker-based law reflects a governmental preference or aversion to the content of the

speech that the law is subject to strict scrutiny under the first amendment. *Turner Broadcasting*, 512 U.S. 622, 129 L. Ed. 2d 497, 114 S. Ct. 2445.

In *Turner Broadcasting*, cable television operators brought actions challenging the constitutionality of the must-carry provisions of the Cable Television Consumer Protection and Competition Act of 1992 (47 U.S.C. § 521 *et seq.* (1992 Supp.)) which required cable systems to carry local broadcast stations. Rather than reaching a hasty conclusion that the must-carry provisions were unconstitutional simply because the provisions treated different speakers differently, the Court instead recognized the difficulty in determining content neutrality and returned to the guiding principle set forth in *Ward* that the primary inquiry in determining content neutrality is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. *Turner Broadcasting*, 512 U.S. at 642, 129 L. Ed. 2d at 517, 114 S. Ct. at 2459, citing *Ward*, 491 U.S. 781, 105 L. Ed. 2d 661, 109 S. Ct. 2746.

> "The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, *even if it has an incidental effect on some speakers or messages but not others.*" (Emphasis added.) *Ward*, 491 U.S. at 791, 105 L. Ed. 2d at 675, 109 S. Ct. at 2754.

If the manifest purpose is to regulate speech because of the message it contains, then clearly the regulation is content-based. By contrast, if the overriding purpose in enacting a law is unrelated to the content of the expression, the law in most instances will be deemed content neutral. *Turner Broadcasting*, 512 U.S. 622, 129 L. Ed. 2d 497, 114 S. Ct. 2445.

Acknowledging that the must-carry provisions distinguished between speakers, the *Turner* Court nonetheless could not justify application of the most exacting level of first amendment scrutiny because there was no evidence that the must-carry provisions threatened free expression or created the potential for censorship or manipulation. *Turner Broadcasting*, 512 U.S. 622, 129 L. Ed. 2d 497, 114 S. Ct. 2445. Instead, the Court found that "the appropriate standard by which to evaluate the constitutionality of [the provisions] is the intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech." *Turner Broadcasting*, 512 U.S. at 662, 129 L. Ed. 2d at 530, 114 S. Ct. at 2469. Under the intermediate level of scrutiny, a content-neutral regulation will be sustained if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First

Amendment freedoms is no greater than is essential to the further-ance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377, 20 L. Ed. 2d 672, 680, 88 S. Ct. 1673, 1679 (1968).

In determining content neutrality of the instant statute, the essential question is whether the legislature preferred commercial speech over noncommercial speech based on the content or the viewpoint expressed by the different speakers. The answer is a resounding no. There is no reason to believe that the regulation is biased in favor of any particular point of view, nor is there evidence of legislative intent to suppress unpopular ideas or to manipulate the public debate in any way. *Turner Broadcasting*, 512 U.S. 622, 129 L. Ed. 2d 497, 114 S. Ct. 2445.

The legislature adopted the statute to prevent the excessive volume emitted from so-called "boom box cars" in order to promote traffic safety (vehicular and pedestrian) and to limit undue noise pollution, which are legitimate, substantial government interests. None of these interests is related to the content of the expression, nor is there any danger of government censorship, manipulation or suppression of free expression.

I disagree with the majority that the exemption for advertising vehicles is sufficient to transform the statute into a content-based regulation and thereby trigger strict scrutiny. There is no evidence that the statute was designed to favor commercial speech or that it was enacted because of the legislature's aversion with the content of amplified noncommercial expression.

The legislature may have rationally concluded that advertising vehicles do not present the same dangers to the public peace and safety and decided to exempt them from the statute. The exemption for advertising vehicles is merely incidental to the manifest purpose of the statute and does not undermine the constitutionality of the regulatory scheme nor does it change the character of the statute as a proper time, place and manner regulation. See *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 69 L. Ed. 2d 800, 101 S. Ct. 2882 (1981) (Burger, C.J., dissenting). So long as the law is not a subtle means of exercising a content preference, a law that distinguishes between speakers is not automatically presumed invalid under the first amendment. *Turner Broadcasting*, 512 U.S. 622, 129 L. Ed. 2d 497, 114 S. Ct. 2445.

The argument that the very basis of the statute was to prohibit (or limit) noncommercial speech in favor of commercial speech must fail. There simply is no evidence of legislative intent to that effect and such a mechanical interpretation of the statute would denigrate the "high purposes of the First Amendment." *Metromedia*, 453 U.S. at 569, 69 L. Ed. 2d at 854, 101 S. Ct. at 2924 (Burger, C.J., dissenting).

"The essential concern embodied in the First Amendment is that government not impose its viewpoint on the public or select the topics on which public debate is permissible." *Metromedia*, 453 U.S. at 553, 69 L. Ed. 2d at 843, 101 S. Ct. at 2916 (Stevens, J., dissenting in part).

The majority's hasty treatment of *Turner Broadcasting* resulted in a misinterpretation of the appropriate standard of review. Had the majority applied the intermediate level of scrutiny as indicated by the *Turner* Court, it would have undoubtedly reached a different result.

With due respect, I also must disagree with the majority's claim that *Discovery Network* speaks to the point of conflict in the instant case. *Discovery Network* struck down a city ordinance that *categorically* and *completely* banned the distribution of *commercial* publications through newsracks located on public property based on the city's failure to provide a neutral justification for the ordinance. As an example of "neutral justification," the Court in *Discovery Network* cited to its decision in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 89 L. Ed. 2d 29, 106 S. Ct. 925 (1986), which upheld an ordinance imposing particular zoning regulations on adult movie theaters. The *Renton* Court recognized that the ordinance did not fall neatly into the "content-based" or "content-neutral" category in that the ordinance treated theaters that specialized in adult films differently from other kinds of theaters. Nonetheless, the ordinance was upheld because it was justified not by an interest in suppressing adult films, but by the city's concern for the "secondary effects" of such theaters on the surrounding neighborhood.

Similarly, the justification for the instant statute is not an interest in suppressing free expression but rather an interest in limiting the "secondary effects" of such uninhibited expression (*i.e.*, limiting the earsplitting noises emitted from "boom box cars"). And, according to *Renton*, even though the instant statute may not fit neatly into either the "content-based" or "content-neutral" category, the statute should be upheld if it can be justified by neutral interests in preserving the peace and tranquility of our state.

The ordinance in *Discovery Network* failed constitutional muster because it was a "categorical," "sweeping," and complete ban. Neither of these descriptions fits the statute at issue here. More importantly, I believe the majority here ignored the Court's admonition that the holding in *Discovery Network* was narrow. "As should be clear from the above discussion, we do not reach the question whether, *given certain facts and under certain circumstances, a community might be able to justify differential treatment of commercial and noncommercial* [speech]." *Discovery Network*, 507 U.S. at 428, 123 L. Ed. 2d at 115, 113 S. Ct. at 1516. Clearly, the Court did not reach the

issue raised in the instant case. Instead, the implication is that, under certain facts and circumstances, a statute that distinguishes between commercial and noncommercial speech may withstand constitutional muster.

Finally, I believe that the requirement of narrow tailoring is satisfied because the statute promotes a substantial government interest that would be achieved less effectively absent the regulation. See *Ward*, 491 U.S. at 797, 105 L. Ed. 2d at 679, 109 S. Ct. at 2757, citing *United States v. Albertini*, 472 U.S. 675, 86 L. Ed. 2d 536, 105 S. Ct. 2897 (1985). The statute targets the problem of excessive noise from "boom box cars" and eliminates that problem without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same problems. *Ward*, 491 U.S. at 799 n.7, 105 L. Ed. 2d at 681 n.7, 109 S. Ct. at 2758 n.7.

In conclusion, even though the sound amplification statute distinguishes among speakers, I believe that it is a content-neutral regulation representing a proper exercise of the state's police power to provide for the relative peace, tranquility and safety of all its citizens. Consequently, I would uphold the statute.